# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | 2:14-cr-00069-JDL-9 |
| JEAN VALBRUN, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT JEAN VALBRUN'S MOTIONS TO SUPPRESS**

Jean Valbrun seeks to suppress all evidence that was gathered as a result of a traffic stop and vehicle search which took place in Auburn, Maine, on March 16, 2014. Valbrun argues that the Auburn Police Officer who conducted the traffic stop, Officer Bernice Westleigh, lacked a reasonable suspicion to stop and detain him, or, alternatively, to prolong the traffic stop any longer than was necessary to issue a traffic ticket. For the reasons discussed below, I deny Valbrun's two motions to suppress.

## I. FACTUAL BACKGROUND

In March 2014, agents of a United States Drug Enforcement Agency ("DEA") Task Force (the "agents" or "monitoring agents") were investigating a suspected drug trafficking conspiracy in Lewiston. ECF No. 811 at 1. Pursuant to a wiretap order authorized by this court, the agents intercepted a series of cell phone conversations between Jacques Victor and Alcindy Jean-Baptiste on March 15 and 16, during which the two men discussed obtaining illegal drugs in Milton, Massachusetts, and transporting them by car to Maine. *Id.* at 1-2.

On March 16, the agents also intercepted calls between Victor and Jonathan Duffaud, in which Victor directed Duffaud to go to a house in Milton, told him to hide "the stuff" under his car, and exhorted him to maintain a low profile and not to give the police a reason to pull him over. Exh. T-06; Exh. T-07. Several hours later, the agents intercepted a similar call from Victor to the defendant, Jean Valbrun, in which Victor told Valbrun to "[l]ook for a good place in the car to hide it well for me," and instructed him not to "let the person driving act like a monkey. Do the speed limit." Exh. T-09. Valbrun told Victor that he would be driving the car. *Id.* Later that day, the agents intercepted a call from Duffaud to Victor telling him that they were passing through Gray, Maine, on Interstate 95. Exh. T-12. Shortly before 4:00 p.m., Victor spoke to Duffaud by cell phone and instructed him to take Exit 75 off of Interstate 95 in Auburn, and to meet him at a nearby gas station. Exh. T-14. Unbeknownst to Valbrun and Duffaud, Auburn Police Officer Bernice Westleigh was waiting in a marked police cruiser on the shoulder of Exit 75.

Westleigh had received a call from Task Force Agent Tyler Michaud, who told her that the monitoring agents believed a car carrying illegal drugs would soon enter Exit 75 from Interstate 95, and requested that Westleigh stop it. Michaud did not describe the car or its occupants other than to tell her that it would have out-of-state license plates. Shortly after she arrived at Exit 75, Westleigh observed a car with Michigan license plates "sweep wide" out of its lane, forcing another vehicle into oncoming traffic. She followed the car for less than 10 seconds and then activated her blue emergency lights and stopped it. After identifying the car's driver as

2

Valbrun and the passenger as Duffaud, Westleigh returned to her police cruiser and spoke via cell phone with Task Force Agent Joey Brown, who was stationed in the Task Force's "wire room" listening to the intercepted telephone calls. Brown informed Westleigh that she had pulled over the car they suspected of transporting illegal drugs.

Westleigh then asked both Valbrun and Duffaud for consent to search the car, and later separately asked for their consent to have a drug-sniffing police dog search the car. Valbrun and Duffaud individually gave their consent to both searches. A Lewiston Police Officer subsequently arrived with a drug-sniffing police dog, which "indicated" on the trunk of the car, meaning that the dog had detected the presence of illegal drugs there. The police officers then searched the car's engine and the trunk. As they did so, the monitoring agents intercepted a series of calls between Victor and Jean-Baptiste in which Victor said that he had a person observing the traffic stop and providing him with updates. ECF No. 811 at 4. Jean-Baptiste told Victor that he told "[the] dude to pull up the carpet; to wrap it in cloth, and then put it all the way in close by the fender in the back[,]" Exh. T-16, and that "[t]he stuff is in the back, way back under the carpet. My cousin is the one that put it man[,]" Exh. T-19.

The police officers subsequently found a plastic bag containing white rice and suspected narcotics in the trunk of the car. ECF No. 811 at 4. Valbrun was arrested because he was the driver of the car and Westleigh considered him to be in control of the vehicle. Duffaud was released. The entire traffic stop lasted approximately two

3

hours.  *Id.* at 3-4.  After being released from the traffic stop, Duffaud called Victor and told him that the police found "the thing."  Exh. T-23.

## II. LEGAL ANALYSIS

Valbrun has filed two motions to suppress.  In the first motion, he argues that Officer Westleigh lacked a reasonable and articulable suspicion to stop the car and detain him.  ECF No. 798 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  Westleigh testified that she observed Valbrun commit a traffic infraction when "his car swerved out of its lane and forced another vehicle into oncoming traffic.  This testimony, which Valbrun does not dispute, establishes that Westleigh had a reasonable suspicion for conducting the initial traffic stop.  *See Lamarche v. Costain,* 225 F. Supp. 2d 83, 86 (D. Me. 2002) (Under Maine law, "[a] traffic stop is supported by sufficient specific and articulable facts where the officer observed the traffic infraction.").  Therefore, Valbrun's first motion to suppress is **DENIED.**

In his second motion, Valbrun quotes *Rodriguez v. United States,* 135 S.Ct. 1609 (2015), to argue that the search of the car was illegal because it took place without a search warrant and "during a time which exceeded the time needed to handle the matter for which the stop was made."  ECF No. 797 (quotation marks omitted).  In *Rodriguez,* the United States Supreme Court held that police authority for detaining a motorist during a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  135 S.Ct. at 1614.  If a police officer wishes to conduct certain checks that are unrelated to the "ordinary inquiries incident to the traffic stop," then she must have "the reasonable suspicion

4

ordinarily demanded to justify detaining an individual." *Id.* at 1615. This requirement was satisfied here.

Westleigh testified that after she stopped the car, she "immediately" made contact with the driver and identified him as Valbrun, after which she returned to her police cruiser—an act that could not have unreasonably prolonged the stop, because "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are part of the ordinary inquiries incident to a traffic stop listed by the *Rodriguez* Court. *Id.* Upon returning to her cruiser, Westleigh spoke by phone to Agent Brown, who informed her that she had stopped the car that the task force suspected of carrying illegal drugs. Brown's testimony corroborated that he was in communication with Westleigh and that he relayed information from the wiretap to her. Thus, the information that Brown related to Westleigh gave her probable cause to justify further detaining Valbrun and searching the car. *See United States v. Winchenbach*, 197 F.3d 548, 555 (1st Cir. 1999)( "the 'fellow officer' rule applies, so that as a general matter . . . the focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation."); *see also, United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002) ("common sense suggests that, where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop.").

Even if Westleigh had not spoken to Brown and thus obtained probable cause to extend the traffic stop and search the car, Valbrun and Duffaud separately consented to a search, and then consented again to having a drug-sniffing police dog sniff the car. "It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). Officers need not have a warrant to search when a person has authority to give consent to a search and freely and voluntarily gives consent. *United States v. Jones,* 523 F.3d 31, 37 (1st Cir. 2008).

Valbrun argued at the suppression hearing that his consent to the dog search was ineffective because it came after Westleigh had a reasonable time to address the initial traffic infraction. This argument is unavailing not only because Westleigh had probable cause to conduct the search, but also because Valbrun and Duffaud first consented to a search of the car a relatively short time into the traffic stop. This first consent applies to a search of the trunk, where the illegal drugs were ultimately found. *United States v. Forbes*, 181 F.3d 1, 7 (1st Cir. 1999) ("[I]f [a defendant] consented to a search of the car, he also consented to a search of the trunk.").

For the foregoing reasons, Valbrun's second motion to suppress is **DENIED.**

**SO ORDERED.**

**This 13th day of August 2015.**

                                                                     /s/    **JON D. LEVY**
                                                                     **U.S. DISTRICT JUDGE**